183 So.2d 805 (1966)
Scott ELLIOTT, alias Scotty Elliott
v.
STATE of Mississippi.
No. 43801.
Supreme Court of Mississippi.
March 14, 1966.
*806 G.H. McLean, Bell & McBee, Greenwood, for appellant.
Joe T. Patterson, Atty. Gen., by R. Hugo Newcomb, Sr., Asst. Atty. Gen., Jackson, for appellee.
INZER, Justice:
Appellant, Scott Elliott, Otis Nester and Philip Bennett were jointly indicted by the Grand Jury of Leflore County for the murder of Cecil Floyd, Jr. Appellant was granted a severance and was tried and convicted of manslaughter. He was sentenced to serve a term of fifteen years in the state penitentiary, and from this conviction he appeals to this Court.
Appellant assigns the following as errors on the part of the trial court:
The trial court erred in overruling the motion of appellant for a directed verdict because:
(a) The State of Mississippi wholly failed to prove the corpus delecti (sic) in this case.
(b) The State of Mississippi wholly failed to prove any charges against this defendant as set forth in the indictment.
The trial court erred in overruling the appellant's motion for a new trial because:
(a) The verdict of the jury is against the overwhelming weight of the evidence in this cause.

*807 (b) The verdict of the jury is contrary to the evidence in this cause.
(c) The State wholly failed to prove the corpus delecti (sic).
(d) The court erred in excluding the introduction of certain documentary evidence consisting of the pleadings filed in the Chancery Court of Leflore County, Mississippi in Cause No. 13,546.
The evidence on behalf of the State shows that the body of Cecil Floyd, Jr. was found between the tracks of the main line of the Illinois Central Railroad at about 6:00 a.m. on the morning of October 1, 1961. The point where the body was found was about two miles south of the city limits of the City of Greenwood near the point where a spur track leads from the main line of the railroad to the factory of the Baldwin Piano Company. The railroad runs in a north-south direction, and Highway No. 49 runs parallel with the railroad about 200 yards east of the railroad. On the west side of the railroad right-of-way is a blacktop road that is used as a service road for the piano factory. A ditch separates this road from the railroad. About 200 yards north of the point where the body was found is a crossing that leads from Highway No. 49 across the tracks to the service road and then to the airport.
Appellant, on and before October 1, 1961, was operating a place located on the west side of Highway No. 49, known as "Scotty's place." This place appears to have been a nightclub which served food, beer and had a place for dancing. It was located some 300 or 400 yards from the point where the body of Floyd was found. The train crew of a freight train traveling north saw the body on the tracks and stopped the train, but not before the engine and several cars had passed over the body. Another train had passed this point about 2:30 a.m. An inquest was held, and a long investigation resulted in the indictment of appellant and the other two men on a charge of murder.
Dr. Daniel Trigg, who was the pathologist for the Greenwood-Leflore Hospital, performed an autopsy on the body of Cecil Floyd, Jr. on October 2, 1961. He testified on behalf of the State that he found multiple fractures of the bones on the left side of the skull, a fracture of the collar bone and the left thigh bone, fractures of the bones in the forearm, the wrist and hand. There were cerebral lacerations on the inside of the brain covering, beneath the brain covering and within the brain itself. He also found multiple contusions and lacerations on various parts of the body. It was his opinion that the injuries to the head were sufficient to cause death and that these injuries were caused by a great mass of force which struck the head. He said this force could have been caused by one blow by a large mass or by repeated blows by a smaller mass. Dr. Trigg signed the death certificate after his examination and findings, and in this certificate he stated that his findings were indicative of deceased being struck by a passing train and that the death was accidental. Dr. Trigg could not swear, from his examination of the body and the history that was available to him at the time he signed the death certificate, that Floyd's death was not accidental.
The other evidence on behalf of the State shows that on the night before Floyd's body was found on the tracks that he was at Scotty's Place between 11:00 p.m. and midnight. He was described by the witnesses as being in a drunken condition. All the proof shows that an altercation took place in the club between Floyd and Philip Bennett. This came about by Floyd's attempting to go behind the counter to use the telephone and being prevented from doing so by Otis Nester. In some manner, Floyd either staggered or was pushed against Bennett who was sitting at the counter. Bennett either hit or slapped Floyd when this happened.
*808 Marjorie Stevens, witness for the State, testified that she was at the counter eating a sandwich when Floyd came over and sat down beside her. A short time later he tried to use the telephone which was behind the counter, and appellant and Nester prevented him from doing so. She said that Floyd bumped into Bennett who was sitting at the counter, and Bennett cursed Floyd and hit him and knocked him into appellant and Nester. According to her testimony, appellant, Bennett and Nester then took Floyd outside the building. After she had finished her sandwich, she went outside the building on her way home. She heard some cursing and blows being struck, and saw Bennett, Nester and appellant in the shadows of the building with the fourth person on the ground, but she was unable to identify this person. She saw that appellant had a pistol in his hand at this time, but she did not see him hit anyone. She got into her car and went on home and did not know anything further about what happened that night. Her testimony was corroborated by the witness Willie Mae Lott, who was employed as a cook by appellant. However, this witness did not see anything that happened outside the building after Floyd was pushed out the door. She said she did hear some cursing and cars being cranked up and leaving.
Charles Wiggins testified on behalf of the State that he arrived at Scotty's Place about midnight on the night in question. He went inside the building and purchased a beer and returned to his car to leave. When he came out of the building, he saw Floyd leaning against the wall of the building. He said he spoke to Floyd, but Floyd did not answer. When he got into his car he found that someone had parked behind him, and he could not leave. While he was sitting in his car drinking his beer, he said that appellant and Bennett came out the door and grabbed Floyd and drug him around the side of the building. Wiggins turned on the lights of his car, and he saw appellant beating Floyd around the face and head with the butt end of a pistol. Bennett was sitting straddle of Floyd, holding him while the appellant hit him. He saw appellant strike Floyd many times, but he was unable to give the number of times. Appellant then took Floyd by his arms and Bennett by his legs and carried him and put him in a Buick car. As they passed the car in which Wiggins was sitting, appellant said to Wiggins that if he did not keep his mouth shut he would be next. Appellant and Bennett then started the car in which they had placed Floyd, and went north on Highway No. 49. Wiggins followed in his car with the lights off. When the Buick reached the intersection of Highway No. 49 and Highway No. 82, it turned left towards the air base. Wiggins did not follow any further and went on home. On cross-examination, he admitted that he had never told anyone about what he had seen and heard until about a month before this trial at the May 1965 Term of the court. It was his statement that his conscience got to bothering him, and he went to the father of Cecil Floyd, Jr. and told him what he had seen and heard on this occasion.
Appellant testified in his own behalf that he was fifty-four years of age at the time of the trial and that he was born and reared in Kentucky. In 1928 he was convicted of the crime of grand larceny in Nashville, Tennessee, and that this was the only conviction on his record. He had been in Greenwood for about seven years prior to 1961. He had worked as a transport driver, and also in a machine shop and welding shop. In January 1961 he began operating the place known as Scotty's. He had known Cecil Floyd prior to the night of September 30, 1961, and he said that Floyd came into his place on three occasions on this night; the first time being about 8:00 p.m., and Floyd only stayed fifteen or twenty minutes with nothing unusual having happened. Floyd came back again about 10:00 p.m., and sat down at the counter beside a man named Billy *809 Lusk. Shortly thereafter, appellant's attention was directed to a crowd around a pinball machine when he heard someone hit the machine. He did not know who hit the machine, but said he hollered at that time words to the effect that somebody is going to buy something they can't eat. He did not know whether Floyd was the person who hit the machine or not, but about five minutes later Floyd told him that he was leaving and that if his daddy called and asked about him to tell him that he had not been there. It was his testimony that Floyd then returned to his place about 1:00 a.m. and at this time Floyd acted like he was under the influence of some narcotic. It was at this time that Floyd started behind the counter and Otis Nester, who was working as a bartender, grabbed him and told him that he could not come behind the counter. Appellant inquired as to the trouble, and Floyd told him that he wanted to use the telephone, and he told Floyd that he would have to use the one in the booth. Floyd went into the booth and had trouble getting his money in the slot, and appellant showed him where to put the money. When Floyd came out of the booth he staggered into Harold Carlyle and bounced into Philip Bennett. When he did this Floyd grabbed Bennett and would not let go of him when Bennett told him to do so. Bennett hit Floyd with the back of his hand, and appellant then told Bennett not to hit him again because Floyd was drunk. Appellant told Floyd to go home because he was drunk, and opened the door and told Floyd good night. He said Floyd replied, "OK, Scotty, I'll see you," and left. According to appellant no one left with Floyd, and he did not see him anymore after that time. He said he never put his hands on Floyd, and after Floyd left, he closed his place and later went to the house in which he lived at the rear of the club. He denied that he had ever hit Floyd with a pistol or with anything else, or that he had anything to do with his death. He denied that Charles Wiggins was at his place on the night in question at any time, and said that he had barred Wiggins from coming there prior to this time. He did not remember whether Marjorie Stevens was there on this night or not. He continued to operate this place until June 1962, when he left Greenwood and went to Indiana. He stayed there about two months and then went to Baton Rouge, Louisiana, where he was living at the time of the trial. On cross-examination he admitted that he kept a pistol at the place, but said that the sheriff was aware of the fact that he kept it there.
Two witnesses for appellant corroborated his testimony as to what happened in the building. R.D. Stigler testified on behalf of appellant, and he said he lived at Sidon at the time in question and that he was on his way to his home from Greenwood on Highway No. 49 between the hours of 1:00 and 1:30 a.m. on the morning of October 1, 1961. When he reached a point about 150 yards north of Scotty's Place, he saw Cecil Floyd, Jr. walking north on the east side of the road and he appeared to be "wobbling." He slowed down but did not stop. He did not remember whether Scotty's Place was open or closed when he passed it, but said he did not notice any cars there at that time.
Appellant contends that the trial court was in error in refusing to sustain the motion for a directed verdict for the reason that the State wholly failed to prove the corpus delicti. This contention is based upon the fact that Dr. Trigg's testimony failed to show affirmatively that the death of Floyd was not accidental and that it resulted from a criminal agency. However, appellant overlooks the evidence on behalf of the State to the effect that prior to being found on the tracks, Floyd was struck several times about the head with a pistol by appellant and that those blows either killed him or rendered him unconscious, and then appellant and Bennett put Floyd in a car and were last seen driving away with Floyd in the car. Much has been written relative to the proof necessary to establish the corpus delicti. We have long since held that the corpus delicti in a homicide case is made *810 up of two fundamental facts, the first being the fact of the death of the deceased, and the second, the fact of the existence of a criminal agency as to the cause of the death. The first element was proven in this case without question. The second element may be proven by circumstantial evidence and by reasonable inferences to be drawn from the evidence. We think that the evidence on behalf of the State was ample to justify the jury in finding that the death of Floyd resulted either directly or indirectly from the beating administered by appellant. King v. State, 251 Miss. 161, 168 So.2d 637 (1964); Keeton v. State, 175 Miss. 631, 167 So.2d 68 (1936); Perkins v. State, 160 Miss. 720, 135 So.2d 357 (1931); Pitts v. State, 43 Miss. 472 (1870).
Appellant further contends that the testimony of Charles Wiggins, which must be relied upon to sustain a conviction, is unbelievable, and as a matter of law, should be disregarded in this case. We have examined the testimony of this witness as shown by the record, and we cannot say that the testimony is so contradictory, unbelievable, untrustworthy or unreasonable that it should not have been considered by the jury. The fact that the witness did not tell anyone what he saw and heard on the occasion in question until a short time before the trial of appellant was a fact for the jury to consider. Appellant requested and was granted an instruction by the trial court to the effect that the jury was the sole and only judge of the credibility of the witnesses and that they could disbelieve any witness in the case, provided they believed from the testimony that such witness had not sworn truthfully. We have held in numerous cases that the jury is the sole judge of the credibility of witnesses and of the weight and worth of their testimony. It is the function of the jury to arrive at the truth of what transpired, and in doing so, it has the right to believe a part of a witness's testimony and disbelieve other parts, or it may wholly disregard the testimony of any witness, if in fact the jury believes that the testimony was untruthful. See Alexander v. State, 251 Miss. 847, 171 So.2d 517 (1965). Appellant also contends that the testimony of Marjorie Stevens is so full of contradictions that no conviction could be sustained on this testimony. What we have said in regard to the testimony of the witness Wiggins applies to her testimony.
Finally, appellant contends that the trial court was in error in refusing to allow appellant to introduce into evidence a petition taken from the chancery court files in cause No. 13,546 on the docket of the Chancery Court of Leflore County. This was a petition filed on September 5, 1962, by Cecil Floyd, Sr., administrator of the estate of Cecil Floyd, Jr., seeking authority to settle a claim on behalf of the estate against the Illinois Central Railroad. It is the contention of the appellant that this evidence was admissible since it was offered for the purpose of showing the results of an investigation into the death of Cecil Floyd, Jr., and a public statement contained in the public records of the county relative to the results of this investigation. The State objected to the introduction of the petition for several reasons, one being that the person who signed the affidavit to the petition was available as a witness and that his testimony would be the best evidence. The State further objected because the petition was irrelevant, immaterial hearsay and secondary evidence. The trial court correctly sustained the objection to the introduction of this evidence. The petition was not offered to contradict any witness who had testified in the case, and the results of an investigation by a person who was not a witness could have no probative value in the trial of this case. The fact that the petition was filed in another court in an entirely different proceeding does not make it competent evidence as an official record in this case. The person who made the affidavit was available as a witness and had appellant desired, he could have used him as a witness. We find no merit in this contention.
*811 We have carefully examined the record in this case and find that the trial court submitted the issues to the jury under proper instructions, and the jury determined from conflicting evidence that the appellant was guilty of manslaughter. The evidence on behalf of the State is sufficient to support the finding of the jury. The trial court was not in error in overruling appellant's motion for a new trial. We find no reversible error, and for this reason this case must be affirmed.
Affirmed.
ETHRIDGE, C.J., and RODGERS, JONES and ROBERTSON, JJ., concur.