924 So.2d 531 (2005)
Bildrick JACKSON, Appellant
v.
STATE of Mississippi, Appellee.
No. 2003-KA-01203-COA.
Court of Appeals of Mississippi.
June 28, 2005.
Rehearing Denied January 3, 2006.
*535 Leland H. Jones, Greenwood, Lisa Mishune Ross, Jackson, attorneys for appellant.
Office of the Attorney General, by Scott Stuart, attorney for appellee.
Before BRIDGES, P.J., CHANDLER and ISHEE, JJ.
*536 CHANDLER, J., for the Court.
¶ 1. Bildrick Jackson was convicted of murder in the Leflore County Circuit Court and was sentenced to a term of life imprisonment. Jackson appeals, raising the following issues:
I. WHETHER THE COURT ERRED IN DENYING JACKSON THE RIGHT TO CROSS-EXAMINE LOVE ABOUT HIS MENTAL CONDITION
II. WHETHER THE CIRCUIT JUDGE ERRED WHEN HE QUASHED JACKSON'S SUBPOENA FOR TAVARES LOVE'S MENTAL EXAMINATION
III. WHETHER LOVE WAIVED HIS PRIVILEGE TO HIS MEDICAL RECORDS
IV. WHETHER THE PROSECUTOR ENGAGED IN PROSECUTORIAL MISCONDUCT
V. WHETHER JACKSON WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
VI. WHETHER JACKSON'S RIGHTS TO A SPEEDY TRIAL WERE VIOLATED
VII. WHETHER THE TRIAL JUDGE ERRED WHEN HE FAILED TO CONDUCT A FRYE HEARING
VIII. WHETHER THE CIRCUIT JUDGE ERRED WHEN HE FAILED TO GRANT JACKSON'S REQUESTED INSTRUCTION THAT THE CORPUS DELICTI HAD NOT BEEN PROVEN BEYOND A REASONABLE DOUBT
IX. WHETHER THERE WERE CUMULATIVE ERRORS RESULTING IN THE DENIAL OF A FAIR TRIAL
X. WHETHER THE TRIAL COURT'S SENTENCING WAS SO HARSH THAT IT WAS CRUEL AND UNUSUAL
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. Bildrick Jackson and Natalia Little ("Tweety") met in Greenwood, Mississippi, when they were in the eighth grade. They dated for the next six years. On August 9, 1999, Tweety gave birth to a daughter, Jalen Artemiev Jamal Little. Tweety filed an application for Aid to Families with Dependent Children with the Mississippi Department of Human Services, naming Jackson as Jalen's father. Jackson requested a blood test, and the test results showed that Jackson was not Jalen's father.
¶ 4. Although the test results showed that Jackson was not Jalen's father, Jackson continued his relationship with Tweety. Jackson treated Jalen as if she were his own daughter and helped pay some of Tweety's bills.
¶ 5. In October or November of 2000, Tweety brought three life insurance proposals home, intending to name Jackson as the beneficiary of the policy. Also during this time period, Jackson called his friend Willie Cannon. Jackson told Cannon that he wanted Cannon's help to kill someone, for a $25,000 reward.
¶ 6. On December 4, 2000, Tweety completed an application for a five year term life insurance policy for $250,000. Tweety named Jackson as the primary beneficiary and Jalen as the secondary beneficiary of the policy. On January 4, 2001, Jackson asked Tavares Love if he would kill someone for $10,000. Love testified that he did not want to make money that way because it was blood money.
¶ 7. On January 8, 2001, Jackson and Tweety had lunch together. After lunch, the couple visited Cannon's apartment. When Jackson entered the apartment, he held the door shut to keep Tweety out. *537 Tweety returned home at approximately 3:30 p.m., and she was upset because Jackson had taken her cell phone. Shortly after returning home, Tweety left "mad walking" between 4:30 and 5:00 p.m.
¶ 8. Marcus Johnson, who was "friends and lovers" with Tweety, saw her on January 8, 2001, at a convenience store between 4:00 p.m. and 5:00 p.m. Tweety appeared as though something was bothering her. According to Johnson, Tweety told him that she wanted to tell him something, but she could not do so because she promised Jackson that she was not going to talk about it. Johnson said Tweety was concerned that she and Jackson could both go to jail if she told him what was bothering her.
¶ 9. Tweety watched Johnson play basketball. After the basketball game, Johnson took Tweety home. When Johnson took Tweety home, she did not want to get out of the truck. "She fiddled around with the lock as though she couldn't get her key in. And when she did get in the house, she slightly closed the door and looked back out to see if I was leaving. So I hit my horn a couple of times to get her mother or sister or whoever was in the house to come to the door to make sure she goes in the house." Johnson testified that she dropped Tweety off some time between 11:00 and 11:30 p.m.
¶ 10. During the evening of January 8, 2001, Jackson was at a dance at Mississippi Valley State University with Love. Love has been diagnosed with bipolar illness and schizophrenia. The dance ended at around midnight. After the dance, Jackson told Love to pick up Tweety so he could speak to her. Jackson told her to be outside and he would pick her up. Jackson and Love came to Tweety's apartment, and she got into the car with them.[1]
¶ 11. As Tweety, Jackson, and Love, were in the car, they drove across the railroad tracks. When Jackson asked if that location would be a good place to dump a body, Tweety said yes. They drove to the other side of a trailer park. When Jackson asked if that location would be a good place to dump a body, Tweety again said yes. Then they drove to a school. When Jackson asked if that location was a good place to dump a body, Tweety said no because there were cameras there.
¶ 12. Jackson, Love, and Tweety then turned on to a gravel road. Jackson told Love to pull over to the side of the road so that he could go to the bathroom. Jackson got out and walked away from the car. When he came back, he told Tweety to get out of the car and come with him.
¶ 13. Tweety got out of the car and walked away. Love was changing a tape in his tape player when he heard gunshots. He looked up and saw Jackson holding a fired gun. Jackson ran to the car and said, "Let's go." Love saw Tweety's body lying on the ground. They drove over a bridge, where Jackson threw his gun into the river. He told Love that he needed to get rid of it.
¶ 14. Love and Jackson then returned to their respective homes. At 4:00 a.m., Jackson knocked on Love's window and told Love they needed to move the body. When Love told Jackson that he did not want to touch the body, Jackson responded that he would not have to do so.
*538 ¶ 15. Love and Jackson drove to the location of Tweety's body. Jackson got out of the car. Love drove away, and when he returned, Jackson was holding a garbage sack. Jackson said Tweety's clothes were inside the sack. They drove to a dumpster and put the sack inside the dumpster. Love did not see what, if anything, was in the bag.
¶ 16. After leaving the dumpster, Love and Jackson went back to the location where Love heard the shots, and Jackson placed what Love believed to be Tweety's body in garbage sacks. Love did not see Tweety's body in the garbage bags. They put the bags into the trunk of the car and drove to the Walthall Street bridge. Love and Jackson pulled the garbage bags from the trunk and threw them from the bridge into the river. Love and Jackson then went to a car wash, where Love washed his car out. They later went to a service station where Love vacuumed the wet carpet. Love and Jackson then returned to their respective homes.
¶ 17. During the afternoon of January 9, Jackson called Love asking Love to drive him to Memphis. Some time that evening, Love picked Jackson up and drove him to the apartment of Jackson's cousin, Frederica Jones, in Memphis to retrieve his ATM card. Jackson left all of his belongings at Jones' apartment except a small bag of clothes. Jackson was unable to find his ATM card. Jackson and Love then returned to Greenwood.
¶ 18. Isakina Little, Tweety's sister, talked to Jones. Isakina reported the information Jones gave her to the police. Law enforcement officers traveled to Memphis to interview Jones. Jones told authorities that Jackson arrived unexpectedly in her Memphis apartment at 10:00 p.m. on January 9, 2001. Jones told police officers Jackson was nervous and unkempt and kept going back and forward to her window. According to Jones, when Jackson left her apartment he was carrying a white envelope about a State Farm Insurance Company insurance policy with Tweety's name on it.
¶ 19. After interviewing Jones, law enforcement officials questioned Love for the first time about Tweety's whereabouts. Love initially denied knowing about Tweety's whereabouts.
¶ 20. On January 27, 2001, Love's mother forced Love to report to the police station. According to Love, after heavy interrogation from his mother, Love claimed Jackson killed Tweety. Love took the police authorities to a remote road to a place where he claimed Tweety's body had been. Ronald Cade, a detective with the Greenwood Police Department, testified that "there was a stain, what appeared to be a stain in the middle of this gravel road, there's a dark area." Cade testified that Love told him, "This is where the body was."
¶ 21. Jackson was arrested on January 29, 2001, pursuant to a warrant for murder issued on January 27, 2001, by the Leflore County Sheriff's Department. On June 4, 2001, Jackson requested a speedy trial. Also that month, the Leflore County Grand Jury returned an indictment for murder. The indictment was not recorded until December 7, 2001. On December 20, 2001, Jackson was arraigned. Jackson's trial commenced on August 13, 2002. The jury found Jackson guilty of murder. Miss.Code Ann. § 97-3-19 (Rev.2000). The judge sentenced him to life imprisonment.

ANALYSIS

I. WHETHER THE COURT ERRED IN DENYING JACKSON THE RIGHT TO CROSS-EXAMINE LOVE ABOUT HIS MENTAL CONDITION
¶ 22. Jackson claims that the judge denied Jackson the right to cross-examine *539 Love about his mental history. Jackson's attorney subpoenaed Love's medical records. The circuit court quashed the subpoena. At trial, Jackson's attorney renewed his efforts to submit Love's medical report into evidence and put information about Love's mental history before the jury, which Jackson claims the circuit court erroneously denied. The following exchange occurred:
BY THE COURT: Well, if he is competent, then how does it [Love's medical records] come in?
BY JACKSON'S ATTORNEY: Comes in to attack his credibility, no different than if he was under the influence of drugs at the time of the alleged incident. Strictly on his credibility. If this man is going to testify that these things occurred, we should be able to cross him on whether or not-what his mental state was at the time and whether or not he has been under the care of a physician, whether he has hallucinated in the past, Your Honor. That's something that this jury needs to know.
BY THE DISTRICT ATTORNEY: Judge, we believe it goes to his character and would be excluded under Rule 608.
BY JACKSON'S ATTORNEY: Your honor
BY THE COURT: Yes, sir.
BY JACKSON'S ATTORNEY: I think the Court's going to have to make a specific finding on the record that it does not go to his credibility.
BY THE DISTRICT ATTORNEY: We thought the Court had already made that ruling.
BY JACKSON'S ATTORNEY: That's why I approached the bench.
BY THE DISTRICT ATTORNEY: That this motion should not be brought back up.
BY JACKSON'S ATTORNEY: I am trying to give [the] Court the opportunity to reconsider.
BY THE COURT: Well, as I understandI am going to stand on my previous ruling. If you want to proffer into the record whatever you think you would have to show, you can certainly go ahead at the appropriate time and do that.
¶ 23. Jackson's attorney was able to ask Love questions about his mental health in a proffer at the judge's chambers, outside the presence of the jury. Love admitted that he had been diagnosed with schizophrenia and bipolar illness approximately two years before Jackson killed Tweety. He admitted that his bipolar condition made him hyperactive, but he denied that he ever hallucinates. After the judge heard the evidence of Love's mental health, he decided that the jury should not know about his mental conditions. The judge found that Jackson's schizophrenia and bipolar illness should not be made known to the jury because the evidence was not relevant as to whether Love could perceive, recall, and remember the events of January 8 and 9, 2001. Jackson claims that the jury erroneously accepted Love's testimony as that of a normal person with no mental disorders. Jackson claims that this denial deprived him of the right to confront all witnesses who testify against him.
¶ 24. Mississippi affords defense counsel wide latitude in cross-examination. Nalls v. State, 651 So.2d 1074, 1076 (Miss. 1995). "The right to confrontation and cross-examination . . . extends to and includes the right to fully cross examine the witness on every material point relating to the issue to be determined that would have bearing on the credibility of the witness and the weight and worth of his testimony." *540 Horne v. State, 487 So.2d 213, 216 (Miss.1986).
¶ 25. Even though a defendant has broad rights to cross-examine witnesses, the trial court judge has a great deal of discretion in determining the admissibility and relevancy of evidence, and, absent an abuse of discretion, the trial court's decision will not be disturbed on appeal. Walker v. State, 878 So.2d 913, 915(¶ 12) (Miss.2004) (citations omitted). M.R.E. 611(a) allows the court "reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation effective for the ascertainment of truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."
¶ 26. Jackson's sole reason for attempting to present to the jury evidence of Love's mental condition was for impeachment purposes. Jackson does not argue that Love's testimony lacked credibility because he was bipolar or schizophrenic. Jackson instead is suggesting that Love might have a tendency to hallucinate and, therefore, his description of Jackson shooting and killing Tweety could have been imagined and should not have been believed. Love testified that he never hallucinates. Jackson's attorney did not suggest that there was evidence in his medical records that might prove otherwise. In other words, the facts of this case support a finding that, if the court had allowed Jackson's attorney to cross-examine Love before the jury about Love's mental condition, the evidence would not have supported Jackson's theory that Love hallucinated. The circuit court judge was within his discretion to exclude the evidence because the prejudicial value of the evidence outweighs the probative value. See M.R.E. 403. This issue is without merit.

II. WHETHER THE CIRCUIT JUDGE ERRED WHEN HE QUASHED JACKSON'S SUBPOENA FOR TAVARES LOVE'S MENTAL EXAMINATION
¶ 27. Jackson subpoenaed medical records pertaining to Love's mental condition. The sole purpose of seeking this evidence was to impeach Love's testimony that Jackson shot and killed Tweety. Love moved to quash the subpoena, claiming that his medical records were privileged. The circuit court judge entered an order quashing Jackson's subpoena for Love's medical records, finding that the records were protected by the doctor-patient privilege. See M.R.E. 503. Jackson's attorney attempted to introduce the evidence at trial, which the circuit court judge denied. Jackson's attorney stated, "And I know that the Court disagrees, but that goes to his credibility as to whether or not the jury is going to believe this man's testimony against our client." Jackson argues that the circuit court judge erred when he quashed Jackson's subpoena for Love's medical records without first conducting an in camera examination of the documents.
¶ 28. To support his position that an in camera examination should have been conducted, Jackson relies on Cox v. State, 849 So.2d 1257, 1272 (¶ 54) (Miss. 2003). In that case, the Mississippi Supreme Court held that a trial judge's decision to admit a witness's medical records was error, but any error was harmless because the jury rendered a guilty verdict. The Cox court suggested certain guidelines to be taken in order to control a criminal defendant's access to a witness's privileged information. "An in camera review by the court of the medical records to determine if the evidence is material, relevant and exculpatory would be appropriate. . . . If the circuit court finds that the records are admissible, the records should be redacted *541 as much as possible to show only the evidence which is relevant and exculpatory." Id. at 1272(¶ 53) (citing Pennsylvania v. Ritchie, 480 U.S. 39, 58-61, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); People v. Bean, 147 Ill.Dec. 891, 560 N.E.2d 258, 269 (1990)).
¶ 29. Jackson believes the holding of Cox is that a circuit court must always conduct an in camera review whenever a defendant subpoenas another person's medical records. We disagree with Jackson's interpretation of this rule. The supreme court held that the doctor-patient privilege is inviolate in most situations. Id. Therefore, the purpose of the in camera review is to safeguard the doctor-patient privilege. The court stated, "There is simply no recognized principle of law by which such recognized privileges as the attorney-client privilege, the priest-penitent privilege or the privilege against self-incrimination can be ignored and the evidence compelled despite the assertion of those privileges no matter the urgency of a criminal defendant's need for the protected information." Id. at 1272(¶ 50) (quoting Windham v. State, 800 So.2d 1257, 1261(¶ 12)(Miss.Ct.App.2001)).
¶ 30. Nothing in Cox suggests that an in camera review is required in all situations that a criminal defendant requests the medical records of someone else. The supreme court merely suggested that the circuit court consider an in camera inspection when the court is considering admitting evidence normally excluded by the privilege. This issue is without merit.

III. WHETHER LOVE WAIVED HIS PRIVILEGE TO HIS MEDICAL RECORDS
¶ 31. Love was named in Jackson's indictment, which alleged that Love was acting in concert with Jackson. However, Love was charged in a separate indictment. In his defense to the charge for which he was indicted, Love filed a request for a mental examination. Jackson claims that Love's request for a mental examination waives the doctor-patient privilege.
¶ 32. In Holland v. State, 705 So.2d 307, 334-35(¶ 86) (Miss.1997), the Mississippi Supreme Court held that a defendant who places his mental condition in issue waives the privilege to the medical records relied upon. The court cited M.R.E. 503(f), which states,
Any party to an action or proceeding subject to these rules who by his or her pleadings places in issue any aspect of his or her physical mental or emotional condition thereby and to that extent only waives the privilege otherwise recognized by this rule. This exception does not authorize ex parte contact by the opposing party.
Jackson argues that Love is a party to this action because he is named in the indictment.
¶ 33. This Court must reject Jackson's claim that Love waived his privilege to keep his medical records private. In this case, Love is not a party to Jackson's murder charge. Black's Law Dictionary defines a party as "one by or against whom a lawsuit is brought. For purposes of res judicata, a party to a lawsuit is a person who has been named as a party and has a right to control the lawsuit either personally or, if not fully competent, through someone appointed to protect the person's interests." Black's Law Dictionary (8th ed.2004). Jackson's indictment did not name Love as a defendant, and Love's criminal charges are named in a separate indictment. Love served as a witness in the proceeding against Jackson and testified against him. The jury was not asked to decide Love's guilt or innocence, and Love had no rights to control Jackson's defense. For these reasons, this Court finds that Love did not waive his *542 right to assert the doctor-patient privilege when he requested a mental examination because he was not a party to the trial.

IV. WHETHER THE PROSECUTOR ENGAGED IN PROSECUTORIAL MISCONDUCT
¶ 34. Throughout the trial, the district attorney wanted to convey to the jury that Love had no reason to fabricate the events leading up to Tweety's murder and Jackson's efforts to cover up the murder. At voir dire, the district attorney told prospective jurors that the State was going to present accomplice testimony. As the district attorney explained, "He is also an eyewitness to this crime, and I want you to know the State of Mississippi is not going to try to hide anything from you, that we are not making any deals with Tavares Love. But certainly, he does expect something, something in exchange for his truthful testimony. But we haven't promised him anything." During Love's direct examination, the district attorney asked Love whether there were any deals in exchange for his testimony. The district attorney withdrew the question after Jackson's counsel objected. During closing arguments, the district attorney told the jury that Love "didn't have any reason to come in here and lie." Jackson argues that the district attorney's behavior was so prejudicial that it deprived Jackson of a fair trial.
¶ 35. Jackson acknowledges that his attorney did not object to any of the district attorney's allegedly improper actions and remarks. However, asks this Court to address Jackson's assignment of error because he claims that a constitutional right has been violated. "[W]here it was alleged that the prosecutor made improper comments during both opening and closing arguments as well as while examining witnesses, but no objections were raised at trial, the defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal." Watts v. State, 733 So.2d 214, 233(¶ 53) (Miss.1999).
¶ 36. In deciding whether an improper comment by the prosecutor requires a reversal, the test is whether or not the natural and probable effect of the statement is to create an unjust prejudice against the accused so as to result in a decision influenced by prejudice. Harvey v. State, 666 So.2d 798, 801 (Miss.1995). The prosecutor's remarks are viewed in light of the entire trial. Donnelly v. DeChristoforo, 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In the present case, the district attorney was unable to bolster Love's testimony on direct examination because Jackson's attorney objected. In addition, attorneys are given wide latitude in their closing arguments to a jury. Johnson v. State, 477 So.2d 196, 209 (Miss.1985). An attorney's function in closing argument "is to draw conclusions and inferences from evidence on behalf of his client in whatever he deems proper, so long as he does not become abusive and go outside the confines of the record." Flowers v. State, 842 So.2d 531, 554(¶ 65) (Miss. 2003). Under these facts, this Court holds that the district attorney's conduct does not rise to the level of plain error.

V. WHETHER JACKSON WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
¶ 37. Jackson argues that his counsel at trial was ineffective for failing to ask Love during cross-examination whether he had been offered any promises by the State in exchange for testifying against Jackson. Jackson also claims that his counsel was ineffective for failing to seek a continuing objection due to the prosecutor's leading questions asked of Love on direct examination, *543 failing to move for a dismissal due to denial of a speedy trial, and failure to hire a DNA expert.
¶ 38. When a defendant raises a claim for ineffective assistance of counsel on direct appeal, the question presented is not whether trial counsel was ineffective but whether the trial judge, as a matter of law, had the duty to declare a mistrial, sua sponte on the basis of trial counsel's performance. Colenburg v. State, 735 So.2d 1099, 1102 (¶ 8) (Miss.Ct.App.1999). Such performance must be "so lacking in confidence that it becomes apparent or should be apparent that it is the duty of the trial judge to correct it so as to prevent a mockery of justice." Parham v. State, 229 So.2d 582, 583 (Miss.1969).
¶ 39. Jackson claims that his trial counsel's failure to cross-examine Love regarding any deals he made with the State incorrectly allowed the jury to accept Love as a witness who had no reason to lie. According to Jackson's brief, three months after Love testified at Jackson's trial, the State dismissed the murder charge against Love and allowed him to plead guilty by bill of information to a charge of accessory after the fact. Love's plea agreement is not part of the record. Because Love's plea agreement is not part of the official record, Jackson cannot claim that his trial counsel's failure to ask Love about any deals he made with the State constituted ineffective assistance of counsel. See Colenburg, 735 So.2d at 1102(¶ 6) (the inquiry of ineffective assistance of counsel, when raised on direct appeal, is strictly confined to the record). Moreover, Jackson has not proven that the plea agreement was in existence at the time Love testified at trial.
¶ 40. Jackson's claim that his attorney was ineffective by allowing the district attorney to ask a series of leading questions to Love also fails. Leading questions rarely create so distorted an evidentiary presentation as to deny the defendant a fair trial. Walker v. State, 880 So.2d 1074, 1077(¶ 8) (Miss.Ct.App.2004). The district attorney's line of questioning in Walker was more egregious than the district attorney's line of questioning in the present case. In Walker, the trial judge at one point injected himself in the matter, called for a break in the testimony, and told the district attorney not to lead his witnesses. Id. Nevertheless, this Court denied Walker's ineffective assistance claim. Similarly, we deny Jackson's ineffective assistance claim.
¶ 41. Jackson argues that his trial attorney was ineffective in failing to ask the court for funds to hire a DNA expert. He does not explain what exculpatory evidence might discovered if a DNA expert were hired but merely claims that a DNA expert favorable to Jackson's case should have been hired to counter the testimony of the experts offered by the State. Because Jackson has not claimed that the outcome of the case would be different if additional DNA experts had testified, this ineffective assistance claim fails. Walker v. State, 863 So.2d 1, 12-13(¶ 22) (Miss. 2003) (citing Mohr v. State, 584 So.2d 426, 430 (Miss.1991)).

VI. WHETHER JACKSON'S RIGHTS TO A SPEEDY TRIAL WERE VIOLATED
¶ 42. Jackson made a request for a speedy trial. Where a defendant's right to a speedy trial has attached, the balancing test set out in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), must be applied. Four factors are to be considered before a court can determine whether the right to a speedy trial has been denied. The four factors are (1) length of delay, (2) reason for the delay, (3) the defendant's assertion of his right to *544 a speedy trial, and (4) prejudice resulting to the defendant.
¶ 43. The Mississippi Supreme Court has held that "[t]he weighing of the Barker factors is not a mechanistic weighing. We must look at the totality of the circumstances." Herring v. State, 691 So.2d 948, 955 (Miss.1997). "When the delay is neither intentional nor egregiously protracted, and where there is a complete absence of actual prejudice, the balance is struck in favor of rejecting the defendant's speedy trial claim." Perry v. State, 637 So.2d 871, 876 (Miss.1994).
¶ 44. Jackson was arrested on January 29, 2001. He made his request for a speedy trial on June 4, 2001. He was arraigned on December 20, 2001, and his trial began on August 13, 2002.
¶ 45. The period from Jackson's arraignment to his trial was within the statutorily required 270 days. Miss. Code Ann. § 99-17-1 (Rev.2000). However, compliance with this statute does not mean that a defendant's constitutional right to a speedy trial has been respected. Bailey v. State, 463 So.2d 1059, 1062 (Miss. 1985). The right to a speedy trial attaches at the time of a formal indictment, or when a defendant has been formally arrested. Smith v. State, 550 So.2d 406, 408 (Miss. 1989). In the present case, Jackson's right to a speedy trial attached on January 29, 2001, the day of his arrest.

Length of Delay
¶ 46. The length of delay "is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." Barker, 407 U.S. at 530, 92 S.Ct. 2182. In the present case, Jackson's trial was held nearly twenty months after his arrest. Although a delay of more than one year is not enough, by itself, to establish that Jackson's right to a speedy trial was violated, it is enough to warrant a close examination of the other Barker factors. Smith, 550 So.2d at 408.

Reason for Delay
¶ 47. The trial was initially set for January 23, 2002. On January 17, 2002, the State filed a motion for a continuance because Love, whom the State claimed was an essential witness, was not available as a witness on January 23. The case was reset for April 1, 2002. On March 29, 2002, the State requested another continuance because Love requested a psychiatric evaluation on March 26, 2002, and he was unable to appear as a witness on April 1 because he was to be evaluated on that day.[2] On June 26, 2002, the court granted the State's third and final motion for a continuance. Once again, the request for a continuance was granted because Love was unable to testify that day.
¶ 48. Where the defendant has not caused the delay, and where the prosecution has declined to show good cause for the delay, we must weigh this factor against the prosecution. Perry v. State, 419 So.2d 194, 199 (Miss.1982). In the present case, the State has shown good cause for requesting a continuance because Love was an essential witness, and because Love's failure to appear was not due to any action by the State.

Actual Prejudice
¶ 49. Jackson claims that he has satisfied the prejudice prong of the Barker test. He claims to have received cruel and unusual punishment based on his pretrial incrimination at Parchman Penitentiary. *545 He complains that he was subjected to intolerable stench and filth, malfunctioning plumbing, exposure to human waste, dangerously high temperatures, insect infestations and other conditions. Jackson claims that the treatment he received before the trial was held demonstrated that he was actually prejudiced from his delayed trial. This Court is unable to consider Jackson's pretrial conditions. He makes his claims about unsatisfactory conditions at Parchman for the first time on appeal. There were no pleadings or trial testimony demonstrating that he was subjected to inhospitable conditions at Parchman. "We will not consider matters which are outside the record and must confine [ourselves] to what actually does appear in the record." Medina v. State, 688 So.2d 727, 732 (Miss.1996).

Conclusion
¶ 50. The State made its requests for continuances because it needed to secure the testimony of an essential witness. Without Love's testimony, the State had no evidence showing that Tweety was shot, killed, placed in garbage bags, and thrown into a river. Because the State requested its continuances for good cause, because the delays were not egregiously protracted, and because Jackson failed to show actual prejudice, this Court holds that Jackson's right to a speedy trial was protected.

VII. WHETHER THE TRIAL JUDGE ERRED WHEN HE FAILED TO CONDUCT A FRYE HEARING
¶ 51. Jackson argues that the trial judge should have conducted a Frye hearing before accepting two of the State's witnesses as experts. Mississippi used to follow the general acceptance standard set forth in Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923), to determine the admissibility of the results of forensic DNA testing. See Gleeton v. State, 716 So.2d 1083, 1087(¶ 12) (Miss.1998). Frye requires that "the thing from which the deduction is made be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye, 293 F. at 1014.
¶ 52. Mississippi has now abandoned the Frye test. Mississippi's method for evaluating the admissibility of expert testimony is found in M.R.E. 702. There is now a two-prong test for evaluating expert testimony. First, the court must determine whether the evidence is relevant, and second, the court must determine whether the proffered testimony is reliable. Mississippi Transp. Comm'n v. McLemore, 863 So.2d 31, 38(¶ 16) (Miss. 2003). In addition, the trial court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Mississippi Transp. Comm'n, 863 So.2d at 37(¶ 13) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). M.R.E. 702 gives the trial judge "discretionary authority, reviewable for abuse, to determine reliability in light of the particular facts and circumstances of the particular case." Id. at 39(¶ 24) (quoting Kumho Tire, 526 U.S. at 158, 119 S.Ct. 1167).
¶ 53. In the present case, the State introduced Gina Pineda and Amy Winters as experts. We find no abuse of discretion in the judge's acceptance of Pineda or Winters as experts. After Winters recited her training, qualifications, and experience, she was accepted, without objection, as an expert in the area of forensic serology. Before trial, Jackson's attorney agreed to stipulate that Pineda was an expert in the field of molecular biology and forensic DNA analysis. In addition, Pineda testified that the techniques she used were accepted worldwide. The trial judge was correct in accepting Winters and Pineda as experts.
*546 ¶ 54. Winters attempted to find the presence of blood in the soil at the location at which Tweety was murdered, and she also looked for the presence of blood in Love's car. When she visually inspected the respective locations and could not find any blood, she used a process called Luminol, which detects the presence of blood that cannot be seen by the naked eye. Winters did detect the presence of blood after she performed the Luminol test. Jackson argues that the trial court should have instructed the jury to ignore Winters' testimony concerning the Luminol test because Winters testified that the Luminol test is not a scientific test accepted to determine the presence of blood to a reasonable scientific certainty. Winters also conducted a Phenylphaline test to detect the presence of blood, and this test did not detect the presence of any blood. For these reasons, Jackson argues that Winters' testimony has no probative value and that the judge should have excluded her testimony. We disagree. The admission of relevant evidence is left largely to the discretion of the trial judge. Federal Land Bank of Jackson v. Wolfe, 560 So.2d 137, 140 (Miss.1989). The judge considered Jackson's attorney's objection and properly held that Winters' testimony had the tendency to show that Jackson committed the murder. See M.R.E. 401. This issue is without merit.

VIII. WHETHER THE CIRCUIT JUDGE ERRED WHEN HE FAILED TO GRANT JACKSON'S REQUESTED INSTRUCTION THAT THE CORPUS DELICTI HAD NOT BEEN PROVEN BEYOND A REASONABLE DOUBT
¶ 55. The corpus delicti which the State must show in a homicide case consists of (1) the death of a human being and (2) a criminal agency causing the death. Hopson v. State, 615 So.2d 576, 579 (Miss.1993). "The criminal agency is usually shown by witnesses who saw the homicide, or by circumstances sufficient to establish the crime to the exclusion of every other reasonable hypothesis." Miskelley v. State, 480 So.2d 1104, 1107 (Miss.1985).
¶ 56. Jackson claims that the State did not prove the corpus delicti. He claims that there was no proof that Tweety died by way of Jackson's criminal act. He argues that the only proof the State produced was the testimony of Love, who testified that he did not see Tweety's face and was unable to testify that Tweety is dead. In addition, Jackson claims that the State failed to prove that the body Love claims to have dumped into the river was Tweety's body. On direct examination, Love testified Jackson removed Tweety's clothes and placed them in a garbage bag, while at the same time admitting that he did not see the body or the clothes in the garbage bag.
¶ 57. Jackson in essence is seeking a motion for a directed verdict. A motion for a directed verdict challenges the sufficiency of the evidence. McClain v. State, 625 So.2d 774, 778 (Miss.1993). On the issue of legal sufficiency, reversal can occur only when evidence of one or more of the elements of the charged offense is such that "reasonable and fairminded jurors could only find the accused not guilty." Hawthorne v. State, 835 So.2d 14, 21(¶ 31) (Miss.2003).
¶ 58. In the present case, there was sufficient evidence for a reasonable and fair-minded juror to infer that Jackson killed Tweety. Love testified that Tweety and Jackson got out of his car and walked into an empty field. While Love was changing a tape in a tape player, he heard a shot, looked up, and saw Jackson holding a gun. Jackson ran to the car and said, "Let's go." When Love and Jackson came to a bridge, Jackson threw his gun into the river because he said he needed to get rid of it. At 4:00 a.m. that same day Jackson *547 knocked on Love's window and told Love they needed to move the body. They drove to the location at which Love heard the shot. Jackson got out of the car. Love drove away, and when he returned, Jackson was holding a garbage bag. Jackson said Tweety's clothes were inside the bag. They drove to a dumpster and put the garbage bag inside the dumpster. Love and Jackson went back to Tweety's body, which had already been wrapped in garbage bags. They put the garbage sacks into the trunk of the car and drove to the Walthall Street Bridge. Love and Jackson pulled the garbage sack from the trunk and threw it from the bridge into the river.
¶ 59. In proving the corpus delicti, the criminal agency may be proven by circumstantial evidence and by reasonable inferences to be drawn from the evidence. Elliott v. State, 183 So.2d 805, 810 (Miss. 1966). Love's testimony is sufficient to allow a reasonable jury to infer that Jackson shot and killed Tweety. The State has proven its corpus delicti.

IX. WHETHER THERE WERE CUMULATIVE ERRORS RESULTING IN THE DENIAL OF A FAIR TRIAL
¶ 60. Individual errors, not reversible in themselves, may combine with other errors to constitute reversible error. Hansen v. State, 592 So.2d 114, 142 (Miss. 1991); Griffin v. State, 557 So.2d 542, 553 (Miss.1990). Where there is no reversible error in any part, there is no reversible error to the whole. McFee v. State, 511 So.2d 130, 136 (Miss.1987). This Court finds no reversible error in any part. Therefore, this issue is without merit.

X. WHETHER THE TRIAL COURT'S SENTENCING WAS SO HARSH THAT IT WAS CRUEL AND UNUSUAL
¶ 61. Jackson was convicted of murder. The judge sentenced him to life imprisonment because it is the only possible sentence available for convicted murderers. Miss.Code Ann. § 97-3-21 (Rev. 2000). "[A] sentence should not be disturbed on appeal so long as it does not exceed the maximum allowed by statute." Davis v. State, 817 So.2d 593, 597 (¶ 14) (Miss.Ct.App.2002) (citing Fleming v. State, 604 So.2d 280, 302 (Miss.1992)). This issue is without merit.
¶ 62. THE JUDGMENT OF THE CIRCUIT COURT OF LEFLORE COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE, TO RUN CONSECUTIVELY WITH PANOLA COUNTY SENTENCE NUMBER 2001-24.387, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEFLORE COUNTY.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
NOTES
[1] The facts contained in paragraphs 10 through 17 were established exclusively through Tavares Love's testimony. Jackson challenges the veracity of these facts because of Love's mental illness, and because Love was indicted for his participation in the events. Jackson claims that Love testified as a witness for the State in exchange for a favorable plea agreement.
[2] The record does not indicate what day the trial was reset.