963 So.2d 1170 (2007)
Daryl MORRIS a/k/a Darryl Morris, Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KA-02016-COA.
Court of Appeals of Mississippi.
March 20, 2007.
Rehearing Denied June 19, 2007.
*1172 Rabun Jones, Attorney for Appellant.
Office of the Attorney General by Deshun Terrell Martin, District Attorney, Joyce Ivy Chiles, Attorney For Appellee.
Before LEE, P.J., GRIFFIS and ROBERTS, JJ.
LEE, P.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. On July 5, 2004, Anthony Nash, a twenty-one year old resident of Leland, Mississippi, and his friends were talking outside of McCray's Grocery, a/k/a Fox Store, in Leland. A man came from around the back of the store and shot Nash two or three times. Nash ran, and the man chased him and shot him two more times in the back after Nash fell to *1173 the ground in the street. No weapon was recovered.
¶ 2. Based on statements from witnesses to the shooting, a warrant was issued and Darryl Morris, a twenty-three year old resident of Greenville, Mississippi, was arrested on July 7, 2004. Morris had no criminal history. At trial, the State argued to the jury that the murder was a result of an ongoing family feud between the Jackson family, of which Morris was a member, and the Nash family. The State presented evidence of fighting between family members which will be discussed more fully as relevant.
¶ 3. Morris did not testify but argued through witnesses at trial that he could not have committed the murder in Leland because he was in Greenville at the time. According to the testimony at trial, Greenville and Leland are approximately fifteen minutes apart but depending on traffic could be less than ten minutes apart. The investigating officer, based on the time of the 911 call, estimated that the shooting occurred between 2:59 and 3:00 p.m. at the latest. Witnesses for Morris presented evidence that he could not have been the shooter because he was in Greenville shopping just moments before the murder. Two receipts were received into evidence from stores in Greenville, one showing a time of 2:19 p.m. and one showing a time of 2:34 p.m.
¶ 4. The first eyewitness to the murder came forward on July 6, 2004. The witness led the police to believe that Morris was the shooter. Two more witnesses came forward in August who also led the police to believe Morris was the shooter.
¶ 5. At trial, Virginia Lowe, Nash's cousin, testified that on July 5 she and Nash were sitting on her porch in Greenville when a red Expedition that she thought belonged to Greg Jackson, Morris's uncle, passed by in front of her house twice. She did not see how many people were in the Expedition or who was driving. On cross-examination, she admitted that she did not know for a fact that it was the same Expedition that drove by both times. According to Lowe, Nash left her house to go home. Soon after he left Lowe heard gunshots. She first called Nash's mother and then within approximately five minutes of hearing the shots she called the police. The police had already received a call.
¶ 6. Jeffrey Butler testified that he was standing outside McCray's Grocery with Nash moments before Nash was shot. Butler described the shooter as a light-skinned man with dark hair. He assumed the shooter was Morris but did not know for certain.
¶ 7. Katina Davenport testified that she was at the house across the street from McCray's Grocery on the day of the murder. She and her cousin, David Thompson, were walking down the driveway to cross the street to go to McCray's Grocery when Darryl Morris ran by with a gun in his hand. Davenport recognized Morris but did not know him personally. When she saw Morris on July 5 he had braids in his hair and a mask or stocking on his head. She testified to seeing Nash run from the grocery store, Morris shooting him, and then shooting him again in the back when Nash fell to the ground. She testified that she was positive that the person she saw shoot Nash was Morris.
¶ 8. David Thompson testified next. He testified that he saw Morris run after Nash and shoot him. He also testified that he had previously seen Morris and Nash fight twice near McCray's Grocery. Thompson had seen Morris around town but did not know his name. Sometime after the shooting, but before talking to the police, Thompson was at another cousin's house and saw a picture of Morris. *1174 He asked the name of the person in the picture. Before this point Thompson did not know Morris's name. Neither Thompson nor Davenport mentioned the name Darryl Morris in their police reports. Each just gave an account of the murder.
¶ 9. Morris's cousin, Marvin Jackson, was with Morris on the day of the murder. He and Morris were in his 1997 red/maroon Ford Expedition. He testified that he and Morris were at the Greenville mall around 2:00 or 2:10 p.m. on the day of the murder. Jackson said that at the mall Morris bought a jersey at Sports Addition. After leaving the mall, they went to Pagers Plus where Morris bought a charger for his cell phone. Jackson testified that he saw Randy Minnix, Jr. at Pagers Plus. Minnix was leaving as they entered the store. Minnix verified this by testifying that he saw Jackson and Morris around 2:25 or 2:30 p.m. in Greenville in the Wal-Mart parking lot near Pagers Plus. Jackson testified that after leaving Pagers Plus he bought a football jersey from a man in the parking lot who was selling jerseys out of his trunk. Dorothy Johnson testified that she knew Morris and Jackson and that she saw them on July 5 in the Wal-Mart parking lot looking at jerseys at approximately 2:30 p.m. She was on her way inside to pay her phone bill. Byron Allen also testified that he knew Morris and saw him in the parking lot of the Wal-Mart looking at jerseys on July 5. He spoke to Morris briefly. After buying a jersey, Jackson took Morris home. Jackson stated that he and Morris did not go to Leland at any point that afternoon.
¶ 10. Minnix testified that after he left Wal-Mart, he went to Leland for a 3:00 p.m. haircut appointment. When he got to Leland he saw police cars and an ambulance on Hudson Street. He estimated that this occurred between 2:50 and 3:00 p.m. Minnix stopped to ask what had happened. Someone told him that Nash had been shot and that Morris was the shooter. Minnix called his father, Randy Minnix, Sr., a Leland police officer, and told him what he heard. Randy Minnix, Sr. knew Morris and called Morris's father at his home in Greenville to ask where Morris was at the time. Morris's father responded that Morris was at home and then handed the phone to Morris. According to the testimony, this call occurred around 3:00 p.m.
¶ 11. Darryl Jackson, Morris's father, testified that Morris came home on July 5 at approximately 3:00 p.m. Jackson testified that just before Morris got home, he received a phone call from Lieutenant Minnix. Jackson was still on the phone with Minnix when Morris walked in the house. Jackson testified that Morris entered carrying a plastic bag containing a jersey from Sports Addition. Morris also had a cash receipt from Pagers Plus. Morris appeared normal and was laughing when he came into the house. The receipt from Sports Addition listed the item sold as a "Portis jersey," but according to the testimony of Greg Jackson and Darryl Jackson the jersey Morris bought read "Bailey," the name of a different football player. The Bailey jersey was entered into evidence. The store tags and price tags had been torn off. Darryl Jackson testified that the jersey was in the same condition as when brought home by Morris. Jackson did not remove any tags from the jersey, and Morris never wore the jersey. Matthew Breaux, the general manager of Sports Addition, testified that the receipt showed the jersey was purchased at 2:19 p.m. on July 5. At the time of trial, Breaux had been employed with Sports Addition for approximately six months. He testified that he had never known of a situation where a jersey that was sold came up on the receipt as the wrong name.
*1175 ¶ 12. On July 21, 2005, a Washington County Circuit Court jury found Morris guilty of murder. Morris was sentenced to life for the murder of Nash.
¶ 13. Morris now appeals to this Court asserting the following issues: (1) reversible error occurred when the state injected irrelevant, highly prejudicial evidence of a fight a couple of days before the alleged murder between Nash and his relatives on one hand, and various members of Morris's family on the other hand, when no connection between Morris and such fight was shown; (2) Morris was denied due process and a fair trial when the trial court allowed the state, in rebuttal and over timely objection, to introduce evidence of a threat made by Morris's uncle while Morris was not shown to be present or have any knowledge of such threat; (3) clear error occurred with the admission of the jailhouse confession testimony of Annanais Miller whose testimony was based in large part on double hearsay and the State's closing argument about such testimony; (4) a violation of defendant's right to confront the witnesses against him under the Sixth and Fourteenth Amendments to the U.S. Constitution as well as article 3, Section 26 of the Mississippi Constitution of 1890 occurred and the trial court committed reversible error when it curtailed the cross-examination of Annanais Miller; and (5) the cumulative effect of all errors which occurred at trial warrants a reversal of defendant's conviction. Issues I and II will be discussed together for judicial economy.
¶ 14. Finding no error, we affirm.

STANDARD OF REVIEW
¶ 15. The standard of review regarding the admission or exclusion of evidence is abuse of discretion. Yoste v. Wal-Mart Stores, Inc., 822 So.2d 935, 936(¶ 7) (Miss.2002). Any error in the admission or exclusion of evidence is not grounds for reversal unless the error adversely affected a substantial right of a party. Lynch v. State, 877 So.2d 1254, 1281(¶ 86) (Miss.2004). Constitutional issues are reviewed de novo. Thoms v. Thoms, 928 So.2d 852, 855(¶ 9) (Miss.2006).

DISCUSSION
I. DID REVERSIBLE ERROR OCCUR WHEN THE TRIAL COURT ALLOWED EVIDENCE OF FIGHTING AMONGST FAMILY MEMBERS BEFORE THE MURDER?
II. WAS MORRIS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT ALLOWED THE STATE, IN REBUTTAL AND OVER OBJECTION, TO INTRODUCE EVIDENCE OF A THREAT MADE BY MORRIS'S UNCLE WHILE THE DEFENDANT WAS NOT SHOWN TO BE PRESENT OR HAVE ANY KNOWLEDGE OF SUCH THREAT?
¶ 16. The State's theory of the case, which it began presenting to the jury in opening arguments, was that Nash's murder was the culmination of an ongoing family feud between the Jackson family, which Morris was a part of, and the Nash family. Morris argues that the trial court erred in allowing the State to enter testimony regarding fights between his and Nash's family. He argues that the testimony was irrelevant and highly prejudicial because, in some instances, no connection was shown between Morris and the fights. Morris's counsel objected to the testimony during the State's opening argument and throughout the trial asserting that it was not relevant, but the objections were overruled.
¶ 17. The State presented evidence of the following fights between the Jackson *1176 and Nash families. In May of 2004, Morris and Nash got into a fight and Nash pulled a gun on Morris. Morris's uncle, Greg Jackson, testified that when Nash pulled out a gun Morris ran. Nash shot at Morris several times but missed. One of the shots hit Jackson in the shoulder. Nash was charged with aggravated assault, but at the time of his death his case had not gone to trial. Marvin Jackson, a/k/a Beehaw, Morris's cousin, testified that he was in two fights with Nash in 2004 prior to Greg Jackson being shot. Morris was not present at the first fight. Morris was present but not involved in the second fight.
¶ 18. Michael Anthony Jackson, Nash's father, testified that he was at his sister-in-law's house when he heard about a fight on the corner near McCray's Grocery. Nash's father walked to the corner to see that his son and Greg Jackson had just stopped fighting. Later, when Nash's father began to walk off, Greg drove by and shouted at him, "You get ready. Your boys are dead." Greg denied making this statement. The record does not reflect if Morris was present at this fight.
¶ 19. According to John Nash, the deceased's uncle, two days before Nash was murdered he and Nash were walking down the street when Greg drove up beside them and started harassing Nash. Later that day Nash and Greg got into a fight. Greg left the scene and came back with his two brothers. Greg and his two brothers jumped Nash's uncle. Morris was not involved in this fight. The record does not reflect if Morris was present.
¶ 20. Morris argues that absent evidence that he was at or involved in the fights, the testimony has no probative value and should have been excluded as being irrelevant and confusing to the jury. Morris asserts that the only relevant fight was the one that happened two days before the murder because it was possible that the parties were still angry due to the close time proximity. However, Morris argues that the State did not specifically prove that he was at this most recent fight or even that he knew about it, and, therefore, this testimony should also have been excluded.
¶ 21. Mississippi Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence must be relevant, and, if so, it is generally admissible. M.R.E. 401 & 402. However, even relevant evidence may not be admissible due to prejudice, confusion, or waste of time. M.R.E. 403. "Rule 403 is the `ultimate filter through which all otherwise admissible evidence must pass.'" Hodges v. State, 912 So.2d 730, 780 (¶ 119) (Miss. 2005) (citing Bounds v. State, 688 So.2d 1362, 1370 (Miss.1997)).
¶ 22. We find that the testimony regarding the ongoing family feud, whether or not Morris was directly involved in each individual altercation, was relevant and was not so prejudicial as to constitute reversible error. Again, the standard of review for the admission or exclusion of evidence is abuse of discretion. Yoste, 822 So.2d at 936(¶ 7). The trial court did not abuse its discretion in allowing the testimony regarding the fighting among the Nash and Jackson families since the testimony had the tendency of making the action more or less probable. See M.R.E. 401 & 402. Morris obviously knew of the ongoing feud and had participated in several altercations with members of the Nash family. Further, Rule 403 was not violated as the probative value of the testimony was not "substantially outweighed *1177 by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R.E. 403.
¶ 23. Morris argues that the testimony regarding the fights was unfairly prejudicial in light of the weaknesses in the eyewitnesses' testimony. Morris points out various inconsistencies in the witnesses' testimony and asserts error in that their testimony was not sufficient alone to overwhelmingly demonstrate Morris's guilt. Morris asserts the same argument regarding the alibi because the jury could have rejected it in light of conflicts. Considering all the testimony, we find that sufficient evidence existed for the jury to find Morris guilty. In a criminal prosecution, the jury may accept the testimony of some witnesses and reject that of others, and may accept in part and reject in part the testimony of any witnesses, or may believe part of the evidence on behalf of the State and part of that for the accused, and the determination of the credibility of such witnesses is not for the reviewing court, but only for the jury. Evans v. State, 725 So.2d 613, 680 (¶ 293) (Miss. 1997). Given that it is the responsibility of the jury to determine the weight and credibility of the evidence, we leave it to the jury to sort out any inconsistencies in the testimony. We find that the trial court did not abuse its discretion in allowing the testimony.
¶ 24. We find Issues I and II without merit.
III. WAS THE ADMISSION OF THE JAILHOUSE CONFESSION TESTIMONY OF ANNANAIS MILLER CLEAR ERROR?
¶ 25. While Morris was in the Leland city jail, Annanais Miller was housed in a nearby cell. Miller was incarcerated on the day of Nash's murder and had been incarcerated for approximately the previous six months on charges of house burglary and aggravated assault with a baseball bat. On July 11, Miller came to the investigating police officers and told them that he overheard information about the murder from Morris's cell. Sergeant Byron Vaughn and Lieutenant Juan Overton testified at trial that Miller came forward on his own and that no deal was offered to Miller for a reduced sentence nor did he ask for a deal. Miller told the officers that he overheard Morris telling another prisoner that he shot Nash. Miller gave details to Vaughn, not repeated at trial due to hearsay exclusions, of the murder. At trial, Miller testified that he overheard Morris telling Byron Jones, another prisoner, that he caught Nash "slipping" at the Fox Store and shot him. Miller testified that slipping meant off guard. According to Miller, Jones and Morris were in adjacent cells. Miller testified that he only heard part of what was said because a large fan and an echo made it difficult to hear. Miller also testified that Jones later wrote him a note that a trustee delivered to his cell saying the same thing. Miller could not read so his cell mate read the note to him. The State showed that no visitors to the jail had informed Miller of the shooting.
¶ 26. Morris argues that Miller's testimony was double hearsay and should have been excluded even though no objection was made at trial. This Court has repeatedly held that "if no contemporaneous objection is made, the error, if any, is waived." Walker v. State, 913 So.2d 198, 238 (¶ 148) (Miss.2005). The contemporaneous objection rule is in place to enable the trial court to correct an error with proper instructions to the jury whenever possible. Gray v. State, 487 So.2d 1304, 1312 (Miss.1986). When hearsay goes into evidence without objection, the *1178 trial court has no opportunity to evaluate the proffered testimony under M.R.E. 803(24), or any other exception. Rubenstein v. State, 941 So.2d 735, 764 (¶ 113) (Miss.2006). For this reason, the failure to object to hearsay operates as a waiver of the issue on appeal. Id. The policy behind the contemporaneous objection rule has been stated by this Court as follows:
It is now well settled that when anything transpires during the trial that would tend to prejudice the rights of defendant, he cannot wait and take his chances with the jury on a favorable verdict and then obtain a reversal of the cause in this Court because of such error, but he must ask the trial court for a mistrial upon the happening of such occurrence when the same is of such nature as would entitle him to a mistrial.
Taconi v. State, 912 So.2d 154, 157(¶ 18) (Miss.Ct.App.2005) (emphasis added).
¶ 27. Whether or not the statement made by Miller was hearsay, Morris made no hearsay objection to Miller's testimony and is now procedurally barred for failure to object. Id. Our only option on appeal is to find that the admission of the statement warrants reversal under the plain error doctrine. When a defendant fails to make a contemporaneous objection, the defendant "must rely on plain error to raise the assignment on appeal." Jackson v. State, 924 So.2d 531, 542(¶ 35) (Miss.Ct.App.2005). We cannot find that the admission of Miller's testimony amounts to plain error. The jury had sufficient evidence, such as the testimony from the two eyewitnesses, to find Morris guilty even without Miller's testimony. Further, given Miller's previous convictions and outbursts on the witness stand, it is possible that the jury did not weigh his testimony heavily in its decision.
¶ 28. Morris also argues that a new trial should be granted because the State embellished Miller's testimony in closing arguments by stating that Miller testified that Morris said that he "had shot him in the head." No objection was made by defense counsel during closing. "In deciding whether an improper comment by the prosecutor requires a reversal, the test is whether or not the natural and probable effect of the statement is to create an unjust prejudice against the accused so as to result in a decision influenced by prejudice." Id. at 542(¶ 36); Harvey v. State, 666 So.2d 798, 801 (Miss.1995). The prosecutor's remarks are viewed in light of the entire trial. Id. We do not find that the prosecutor's misstatement in closing created an unjust prejudice against Morris. Miller testified that he overheard that Nash was shot, and counsel for the State said in closing that Miller testified that Nash was shot in the head. The statement in closing, although an exaggeration of Miller's testimony, did not amount to plain error. It is unlikely that the jury was confused or their decision prejudiced by this slip of the tongue. We find that this misstatement does not warrant reversal.
¶ 29. We find that neither Miller's testimony nor the misstatement by the prosecution involved a fundamental right, and, therefore, neither argument amounts to plain error. Issue III is without merit.
IV. WAS MORRIS'S RIGHT TO CONFRONTATION VIOLATED AND DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY LIMITING THE CROSS-EXAMINATION OF ANNANAIS MILLER?
¶ 30. Morris argues that his Sixth Amendment right to confrontation was violated when the trial judge cut short Miller's testimony concerning the conditions of his confinement. Morris's assertion at trial was that Miller was not a credible *1179 witness because he received a lenient sentence for testifying against Morris. As to Miller's aggravated assault charge, his testimony on cross-examination of which Morris now complains is as follows by Morris's counsel, Johnnie Walls.
Q: And so how much time you say you got for that?
A: A year and two more to serve on paper.
Q: A year
A: And two to serve on paper.
Q:and two to serve on paper, which means you got a year on house arrest.
A: Yes, sir.
. . . .
Q: You were in prison.
A: Could I ask you a question?
Q: Yeah, go ahead.
A: I don't feel like talking about that.
Q: You don't feel like talking about it.
A: Because it made me angry.
Q: Well, don't you know that when you come to court, you have to talk about it? Especially after you sit up there and you got another lawyer on the other side have to ask you questions, don't you realize you have to talk about it now?
A: Yes, sir.
Q: You didn't tell her you didn't want to talk about it, did you?
A: Know what I'm saying, it made me more angry, know what I'm saying, about talking about it, know what I'm saying.
Q: More angry?
A: Yes, sir. Make me just come back, know what I'm saying
Q: What are you angry about?
A: I'm just saying I don't want to talk about it, because, you know what I'm saying, I already served my time and it's over with, know what I'm saying.
Q: But what you're here for is that you coming in here saying that this young man over there told you or you heard him say that he killed somebody.
A: Yes, sir.
Upon hearing objections by Morris's counsel out of the hearing of the jury concerning the relevancy of the questioning, the court ruled as follows:
THE COURT: I think that's right. If you want to ask him about his-any deal that he got, I think that's permissible, but I think this questioning about the conditions of his confinement, I don't think that's relevant to anything. I mean, I don't think it impacts on his credibility to the jury . . .
Questioning by Morris's counsel concerning Miller's confinement continued as follows:
Q: What'd [Officer Overton] say to you?
A: He had asked me, you know what I'm saying, did you know something, and I said . . . yeah, I know a little bit. Where he likeknow what I'm sayinghe say he had something to tell me but he ain't never told me.
Q: All right. When you told him you knew a little bit, did he say, man, this might be able to help you out a little bit?
A: No, he ain't said that.
¶ 31. Miller next testified that after he gave the statement to Officer Overton he was moved to the county jail. Miller said that he wanted to go to the county jail and had been trying to do something to get moved. He then stated that the reason he was moved was because he was acting out *1180 in his cell by throwing mattresses, flooding his cell, etc. and not because of his statement to the police. Miller next testified as to the length of time he served and the time he was on house arrest. The questioning proceeded as follows:
Q: . . . You served less than six months, and you say you got not [sic] favorable treatment for your testimony?
A: I'm fixing to break it down for you. I didthe time I did in jail, that count to the time they gave me. Six months down in Leland jail.
Q: Well, that means you got no time at all then.
A: Then I did a year and two to serve on paper. That's enough for me, you know what I'm saying.
This was the conclusion of the cross-examination.
¶ 32. Morris's main objection to the limitation put on Miller's testimony was the statement by the trial judge, "I think this questioning about the conditions of his confinement, I don't think that's relevant to anything." Regardless of this statement, Morris's counsel was able to ask numerous questions about Miller's motive in giving the statement to the police about Nash's death. Miller stated several times during questioning that he did not receive favorable treatment for testifying. The fact that Morris did not receive the answer that he wanted does not mean that his counsel could continue repetitious questioning until he got a desirable answer. We cannot find where the trial court unduly restricted cross-examination.
¶ 33. This issue is without merit.
V. DO CUMULATIVE ERRORS MADE AT TRIAL WARRANT REVERSAL OF MORRIS'S CONVICTION?
¶ 34. Having found no abuse of discretion by the trial court in any of the above issues, we cannot find that cumulative error denied Morris a fair trial. This issue is without merit.
¶ 35. THE JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.