GRIFFIS, P.J.,
for the Court:
¶ 1. Kelvin McKnight was convicted of murder. On appeal, McKnight argues that: (1) the prosecutor did not have a good-faith basis for certain questions he asked a defense witness on cross-examination; (2) the prosecutor used as substantive evidence a videotape that was admissible solely for impeachment purposes; (3) the prosecutor gave improper advice to the jury about the jury instructions during closing arguments; (4) there was insufficient evidence to support his conviction or, alternatively, that the verdict is against the overwhelming weight of the evidence; and (5) his attorney was ineffective and thereby deprived him of his constitutional right to counsel. We find no reversible error; therefore, we affirm the circuit court’s judgment and McKnight’s conviction.
FACTS
¶ 2. On August 28, 2008, McKnight traveled from his home in Jackson to Louise, Mississippi, where his brother Larry McKnight (“Larry”) lived. McKnight arrived at Larry’s house at approximately 3:00 p.m. The two brothers went to the car wash, which was a popular hangout in Louise, where they met Larry’s friend Roderick Langston.
¶ 3. At approximately 7:00 p.m., Larry went to work at a local fish farm. Larry returned to the car wash at approximately 8:45 p.m., while Larry was on his lunch break.
¶ 4. According to Larry and McKnight, they then drove in Larry’s work truck with Langston to Larry’s house. Larry and McKnight sat in the truck while Langston went inside. Larry testified that Lang-ston returned to the truck with a handgun. Larry also testified that McKnight was in the back seat and could not see the gun.
*1147 ¶ 5. According to Larry and McKnight, they dropped Langston off at the car wash. They then went to the Fountain Club, a bar located a few blocks away. They pulled up to the club in Larry’s truck. Three witnesses for the State testified that Langston was with Larry and McKnight. Larry and McKnight testified that they were alone.
¶ 6. At the club, Larry got into an altercation with Herbert Broomfield and Jessica Amons. Broomfield and Amons were dating. The altercation was over an earlier affair between Larry and Amons. Amons hit Larry over the head with a beer bottle, and then several people starting punching and kicking Larry while Broom-field held him in place. At the same time, McKnight and Langston got into a fight.
¶ 7. Anneice Hoskins was an eyewitness who testified that McKnight tried to help Larry, but Langston restrained him. Amons testified that she saw McKnight and Langston fight, but she did not know what it was about. McKnight testified that when he tried to help Larry, Lang-ston grabbed him and started punching him. The owner of the club then yelled at everyone to stop fighting and kicked everyone out of the club.
¶ 8. Amons testified that she got in her car, and as she was driving away, she heard a gunshot. Broomfield testified that he had already left the club on foot and was en route to his house, which is near the club, when he heard a gunshot.
¶ 9. Hoskins testified that McKnight yelled at the crowd in the parking lot: “When you see that weak-ass ni* *er Roderick Langston, tell him I’m going to deal with him in the street!” Then, Langston emerged from the crowd and said, “I’m right here.” Hoskins then heard a gunshot and saw Langston fall forward.
¶ 10. Roy Montgomery testified that McKnight yelled: “Roderick Langston, you bitch-ass ni* *er, next timé I see you I’m going to deal with you!” Langston replied: “Here I am.” According to Montgomery, McKnight then pulled out a gun and shot Langston.
¶ 11. Larry testified that he was hunched over by his truck in a significant amount of pain when he heard someone say: “[Langston], don’t do that!” Then, he heard a gunshot, and seconds later he saw McKnight run toward the truck.
¶ 12. McKnight testified that he had found a gun on the floor of the club during the fight. In the parking lot, he heard someone say: “[Langston], don’t do that!” He turned around and saw Langston “coming from behind his back with it in his hand.” He then tried to fire a warning shot into the air but accidentally struck Langston.
¶ 13. A bullet penetrated Langston’s skull, lodged in his brain, and caused his death. After Langston’s death, Larry and McKnight fled the scene in Larry’s truck. Larry dropped McKnight off at the car wash. McKnight got in his car and left town. Larry went to the fish farm where he worked. Larry was arrested there later that night. McKnight turned himself in a few days later.
¶ 14. McKnight was charged with murder under Mississippi Code Annotated section 97-3-19(1) (Rev.2006). The jury found him guilty, and he was sentenced to life. His appeal was deflected to this Court for review.[1]
*1148 ANALYSIS

1. Whether it was plain error for the prosecutor to ask questions to Larry without a good-faith basis for the questions.

¶ 15. After his arrest, Larry gave a videotaped statement to the police. The defense called Larry as a witness at trial. On cross-examination, the prosecutor tried to impeach Larry’s testimony with prior inconsistent statements contained on the videotape. The prosecutor did not play the tape at that time, but he did play the tape later during his rebuttal and again during his closing argument.
¶ 16. McKnight claims that several of the questions the prosecutor asked Larry were not supported by the videotape. McKnight argues that it was error to allow these questions because the prosecutor had no good-faith basis for the questions. Because McKnight’s trial attorney did not make a contemporaneous objection at trial, McKnight must rely on the plain-error doctrine on appeal.
¶ 17. The Mississippi Rules of Evidence do not require that a cross-examiner first produce proof of a witness’s prior inconsistent written or oral statement. M.R.E. 613. Nevertheless, although no proof is required, the cross-examiner must have a good-faith basis for his questions. Flowers v. State, 773 So.2d 309, 326 (¶ 58) (Miss.2000). The cross-examiner must have some legitimate reason to believe that the witness did in fact make the prior inconsistent statement.
¶ 18. The following exchange occurred between the prosecutor and Larry:
Q. Isn’t it true that you' told the law enforcement officer when he was videotaping you that [McKnight], your brother, went to the club before you did? I mean, excuse me. Went to the truck before you did?
A. No. He — no, sir.
[[Image here]]
Q. And isn’t it true you told the officer that your brother got the pistol from the truck and he turned around and made the statements about he was going to do to [Lang-ston] on the street — about what he was gonna do to him on the street? Isn’t it true you told that in the videotape?
A. I don’t recall.
[[Image here]]
Q. Isn’t it true that you told the officers that [Langston] overheard [McKnight] talking about him and that [Langston] stepped off the steps of the club and started walking to [McKnight]?
A. No, sir, I didn’t.
Q. And isn’t it true that you told the officers when [Langston] got a few feet from him, [McKnight] pulled out his gun and shot [Langston] immediately?
A. No, sir, I didn’t.
¶ 19. The videotape revealed that Larry told the police that, after the owner of the club had yelled at everyone to get out, a large crowd moved toward the exit. Larry was in the back of the crowd and could not see very much. Larry heard McKnight and Langston were fighting. Larry then heard Langston say: “Shit, you can get it too!” He saw Langston, Broomfield, and a couple other “young bucks” move toward where he thought McKnight was. He heard a gunshot and saw Langston fall. He saw McKnight and told him, “Let’s get out of here.” They got in the truck together and left. On the tape, Larry did not say that: McKnight went to the truck first to get a gun; McKnight said that he was going to do something to Langston on the street; or he saw McKnight shoot Langston.
*1149 ¶ 20. After a review of the videotape, it appears that the prosecutor did not have a good-faith basis to ask the questions that he asked Larry. These questions could be considered error. However, because McRnight’s attorney did not raise a contemporaneous objection at trial, this issue is procedurally barred from appellate review unless it constitutes plain error. Morris v. State, 963 So.2d 1170, 1178 (¶ 27) (Miss.Ct.App.2007).
¶ 21. Only an error that affects the defendant’s substantial rights rises to the level of plain error. Taylor v. State, 754 So.2d 598, 603 (¶11) (Miss.Ct.App.2000) (citation omitted). “To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial.” Cox v. State, 793 So.2d 591, 597 (¶ 22) (Miss.2001) (citations omitted).
¶ 22. We conclude that any error based on this issue does not constitute plain error for at least two reasons. First, we do not find that the error affected the outcome of the trial. The testimony of both Hoskins and Montgomery was compelling evidence that supported the jury’s verdict. Their testimonies were not affected by the prosecutor’s exchange with Larry. Second, the videotape was played to the jury. The prosecutor played the tape during his rebuttal and again during his closing argument. The jury twice heard for itself what Larry had told the police. To the extent the prosecutor might have misled the jury with his questions, the jury actually heard what Larry said on the videotape. The jury was not misled about what Larry said on the videotape. Because we do not find plain error present, we find this issue has no merit.

2. Whether it was plain error for the prosecutor to use the videotape, which was admissible solely for impeachment purposes, as substantive evidence.

¶ 23. The prosecutor played the videotape of Larry’s interrogation during closing arguments. While playing the tape, the prosecutor commented on Larry’s physical appearance in the video. He argued that Larry’s appearance in the video did not support his earlier testimony that he had been severely beaten at the club. Indeed, the only injury to Larry visible in the video, which was made on the night of the incident, was some slight swelling under his left eye.
¶ 24. On appeal, McKnight claims that the prosecutor impermissibly used the tape, which was admissible solely to impeach Larry’s testimony, as substantive evidence during closing arguments. He argues that the prosecutor used the tape as evidence that McKnight had “used excessive force, or, for reasons other than self-defense, shot the deceased — two material issues of fact in the case.” Again, because defense counsel did not raise a contemporaneous objection at trial, McKnight relies on the plain-error doctrine on appeal.
¶25. We find that the prosecutor did not use the tape as substantive evidence. Larry had testified that he had been savagely beaten at the club. During closing arguments, the prosecutor argued that Larry’s physical appearance in the video was not consistent with a man who, just a few hours before the video was recorded, had been savagely beaten. Thus, the prosecutor used the tape to impeach Larry’s testimony, not as substantive evidence. Further, even if the prosecutor had used the tape as substantive evidence, we find that the use of the videotape did not affect McKnight’s substantial rights and, as such, *1150 did not amount to plain error. Taylor, 754 So.2d at 603 (¶ 11). Therefore, this issue is without merit.

3. Whether the prosecutor’s comments on the jury instructions during closing arguments amount to plain error.

¶ 26. McKnight raises four issues that concern the jury instructions and the prosecutor’s comments about the instructions during closing arguments. Once again, because timely objections were not made at trial, McKnight relies on the plain-error doctrine on appeal.
¶ 27. The circuit court gave a jury instruction on the lesser-included crime of manslaughter. The manslaughter instruction reads, in part, as follows:
If you should find the State has failed to prove all the essential elements of Murder beyond a reasonable doubt, you will then proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all of the essential elements of the lesser crime of Manslaughter.
During closing arguments the prosecutor stated: “ ‘If you find the State has failed to prove an essential element of the charge of murder’ — You’re not gonna find that, which means that instruction has no application.” McKnight now claims that the prosecutor impermissibly instructed the jury to disregard the manslaughter instruction.
¶ 28. The circuit court also instructed the jury on self-defense. The instruction read, in part, as follows:
There must be something shown in the conduct of [Langston], the victim, at or about the time of the killing indicating a present intention to kill [McKnight], or to do him some great personal injury [.]
(Emphasis added). During closing arguments, the prosecutor stated self-defense would not apply if “a reasonable person would not have had the belief that [Lang-ston], at or about the time of the killing, was indicating a present intention to kill [McKnight].” On appeal, McKnight argues the prosecutor, in his restatement of the self-defense instruction, deliberately omitted the phrase “or to do him some great personal injury,” and as a result, the jury was misled about self-defense.
¶ 29. The circuit court also instructed the jury on its duty to determine the credibility or believability of the witnesses. The prosecutor chose not to mention that instruction during his closing argument. On appeal, McKnight complains, while the prosecutor mentioned other instructions, the prosecutor did not mention that one.
¶ 30. Finally, the original typewritten self-defense instruction used the word “murder.” The word “murder” was struck through and the word “killing” was handwritten above it. Obviously, a “killing” may be justifiable, while a “murder” is, by definition, not justifiable. On appeal, McKnight complains that the word “murder” was still visible on the jury instruction.
¶ 31. Each of these issues are procedurally barred because defense counsel failed to make a contemporaneous objection at trial. The contemporaneous-objection rule serves a vital role in our judicial system, and only errors that affect substantial rights will cause this Court to circumvent that rule. Taylor, 754 So.2d at 603 (¶ 11). Further, we find that none of these concerns with the jury instructions constitute plain error. Accordingly, we find no merit to this issue.
A Whether there was sufficient evidence to support the conviction and whether the verdict is against the overwhelming weight of the evidence.
¶ 32. McKnight’s counsel moved for a judgment notwithstanding the verdict *1151 or, alternatively, a new trial. McKnight renews these arguments on appeal. He claims that the prosecutor failed to present sufficient evidence to sustain a conviction of murder; therefore, a judgment notwithstanding the verdict should have been granted. He also claims that the jury’s verdict is against the overwhelming weight of the evidence; therefore, a new trial should have been granted.
¶ 33. When reviewing the sufficiency of the evidence, we examine the evidence in the light most favorable to the State to determine whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (citation omitted). When reviewing a claim that the verdict is against the overwhelming weight of the evidence, “we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Id. at 844 (¶ 18) (citation omitted).
¶ 34. Here, there was more than enough evidence to support the jury’s findings that McKnight killed Langston with deliberate design and not in self-defense. The testimonies of Hoskins and Montgomery supported the jury’s findings. Hos-kins testified that, in the parking lot of the club, McKnight said, “When you see that weak-ass ni* *er Roderick Langston, tell him I’m going to deal with him in the street!” Similarly, Montgomery testified that McKnight said: “[Langston], you bitch-ass ni* *er, next time I see you, I’m going to deal with you!” According to both Hoskins and Montgomery, Langston then emerged from the crowd and said, “Here I am.” Montgomery testified that McKnight then pulled out a gun and shot Langston in the head.
¶ 35. The only real issue was whether McKnight had acted in self-defense. According to Montgomery, Langston was merely walking toward McKnight when McKnight shot him. Montgomery testified: “[Langston] didn’t break a run like he was fixing to do nothing. He just was like, ‘Here I am’ and started walking toward[] him. And [McKnight] pulled out the pistol and shot him.” Montgomery further testified that Langston was not threatening McKnight in any way.
¶ 36. After a thorough review of the record, we find there was sufficient evidence to support McKnight’s conviction. We also find that the jury’s verdict is not against the overwhelming weight of the evidence. Accordingly, these issues are without merit.

5. Whether defense counsel provided ineffective assistance.

¶ 37. McKnight argues that he was deprived of his constitutional right to counsel by his trial attorney’s deficient performance. On this basis, McKnight argues that he is entitled to a new trial.
¶ 38. To prove ineffective assistance of counsel, McKnight must show that: (1) his counsel’s performance was deficient, and (2) this deficiency prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The burden of proof rests with McKnight to show both prongs. McQuarter v. State, 574 So.2d 685, 687 (Miss.1990). Under Strickland, there is a strong presumption that counsel’s performance falls within the range of reasonable professional assistance. Strickland, 466 U.S. at 689, 104 S.Ct. 2052. To overcome this presumption, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694,104 S.Ct. 2052.
¶ 39. The merits of an ineffective-assistance-of-counsel claim on direct *1152 appeal should be addressed only when: “(1) the record affirmatively show[s] ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.” Colenburg v. State, 735 So.2d 1099, 1101 (¶ 5) (Miss.Ct.App.1999). If this Court does not reverse on other grounds and is unable to conclude that the defendant received ineffective assistance of counsel, it should affirm “without prejudice to the defendant’s right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings.” Id. Review on direct appeal of an ineffective-assistance-of-counsel claim is confined strictly to the record. Id. at 1102 (¶ 6).

a. Failure to File Pretrial Motions

¶ 40. McKnight argues that his attorney was deficient because he failed to file a single pretrial motion, with the exception of a motion for continuance. He claims that the attorney “failed to file a single motion for discovery, suppression of evidence, or any other action that could have helped his client develop the theory of self-defense at trial.” He claims that discovery could have produced a bloody towel that was found in the club by an investigating police officer. He claims that the blood on the towel could have belonged to Larry, and if so, the towel could have somehow supported McKnight’s self-defense theory. He also claims that discovery could have produced Larry’s medical records, which could have supported Larry’s testimony that he was severely beaten at the club that night.
¶41. This discovery would not have affected the outcome of the trial. The question facing the jury was whether, at the time of the shooting, Langston presented a threat of death or serious bodily harm to McKnight. We are not convinced that the bloody towel or Larry’s medical records would have factored into the jury’s decision, let alone changed its verdict. As for the attorney’s failure to file a motion to suppress evidence, McKnight fails to state exactly which piece of evidence could or should have been suppressed.
¶ 42. This Court has held that: “[T]he mere fact that the attorney did not file a motion for discovery is not sufficient to raise an ineffective assistance of counsel claim.” Graham v. State, 861 So.2d 1053, 1056 (¶ 16) (Miss.Ct.App.2003) (quoting Powell v. State, 536 So.2d 13, 16 (Miss.1988)). Accordingly, this issue is without merit.

b. Failure to Subpoena Witnesses, Interview Witnesses, or Conduct a Pretrial Investigation

¶ 43. Next, McKnight argues that his attorney was deficient because he failed to subpoena a single witness, interview any witnesses, or conduct a reasonable factual investigation. McKnight, however, does not state exactly who should have been subpoenaed and what they would have testified to had they been subpoenaed. As result, this Court has no basis to conclude that the attorney’s failure to subpoena witnesses affected the outcome of the trial.
¶ 44. The allegations that defense counsel did not interview any witnesses or conduct a factual investigation appear to be only speculation and conjecture. Because our review is confined to the record, we cannot engage in speculation about what the attorney might or might not have done to prepare for trial. We also disagree with McKnight’s assertion that “the record strongly supports an inference” that the attorney failed to interview witnesses or conduct an investigation. Based on the record before us, it appears that the trial counsel was competent, made strategic decisions, and performed in a reasonable, although not perfect, manner in a difficult case.
*1153 c. Angela Jones’s Testimony
¶45. At trial, McKnight’s attorney called a witness who initially identified herself as Angela Jones. Angela testified that she was at the club on the night of the incident. She stated that she had gone to the club to meet a man. As she was standing outside waiting on the man, she saw Langston and McKnight exit the club. She testified that Langston had a gun in his hand. Then she heard someone shout, “[Langston] don’t do that!”
¶ 46. Angela later confessed to the sheriff that she had made it all up. The prosecutor called her to the stand in his rebuttal. She admitted that her name is really Angela McKnight and that she is McKnight’s cousin. She further admitted that she was not at the club that night and that she and McKnight’s sister, Gwendolyn McKnight, had conspired to fabricate her earlier testimony. She testified that she did not know whether McKnight was aware of their plan or not.
¶ 47. This turn of events undoubtedly put McKnight’s attorney in a difficult position. He chose not to move for a mistrial. Instead, he attempted to repair his and McKnight’s credibility. On cross-examination of Angela, defense counsel elicited from her that she had never discussed her plans to give false testimony with McKnight or McKnight’s attorney. During closing arguments, he profusely apologized to the jury for having unwittingly put on false testimony. He pointed out that there was no reason to believe that McKnight was aware of Angela’s plans. And then, he tried to refocus the jury’s attention on the central issue in the case, which was whether McKnight had acted in self-defense.
¶ 48. On appeal, McKnight argues that his attorney’s decision to call Angela to the stand constituted deficient performance. He claims that the attorney clearly had not interviewed Angela prior to her testimony and that a competent attorney would have detected her fraud earlier. When her fraud was discovered, McKnight argues that his attorney should have moved for a mistrial.
¶ 49. Because our review is confined to the record, we do not have any evidence to indicate whether the attorney interviewed Angela or not. We do not know what steps the attorney took to ascertain the truthfulness of Angela’s expected testimony. It is entirely possible that the attorney had no reason to believe that Angela was a perjurer and that he had done everything a reasonably competent attorney would have done under the same circumstances. Thus, we cannot conclude that the attorney’s performance was deficient in this respect. This issue is clearly better suited for consideration in a motion for post-conviction collateral relief.
¶50. As for the contention that the attorney should have moved for a mistrial, we find that his decision to proceed with the trial and attempt to repair his and his client’s credibility falls within the ambit of trial strategy. See Berry v. State, 882 So.2d 157, 165-66 (¶ 29) (Miss.2004) (holding that it was trial strategy not to move for a mistrial after the prosecution’s discovery violation). Further, it is not clear that the circuit court would have granted the motion had the attorney made it, especially since it was the conduct of the defense that had established the alleged ground for a mistrial. Circuit courts have discretion to grant or deny motions for a mistrial, and this Court reviews the courts’ decisions under an abuse-of-diseretion standard. McDonald v. State, 881 So.2d 895, 902 (¶ 28) (Miss.Ct.App.2004).
¶ 51. We cannot say that the attorney’s decision to not move for a mistrial was deficient, nor can we say, to a reasonable probability, that the motion would have *1154 been granted had it been made. Accordingly, this issue is without merit.

d. Failure to Advance the Self-defense and Defense-of-others Theories

¶ 52. McKnight argues that his attorney failed to advance two meaningful theories of defense — defense of others and self-defense. He argues that, at the time of the shooting, Langston could have posed a threat of death or serious bodily harm to either Larry or McKnight, either of which would have justified McKnight in killing Langston, yet the attorney failed to pursue those theories.
¶ 58. First, defense of others was not a viable theory of defense. Indeed, the jury was not instructed on the theory because the evidence did not support it. There was no evidence that, at the time of the shooting, Langston posed any threat to Larry. Larry’s own testimony was that, at the time of the shooting, he was hunched over by his truck. None of the witnesses testified that Langston was anywhere near Larry when the shot was fired.
¶ 54. Second, McKnight’s attorney zealously pursued the self-defense theory. He called Larry and McKnight to the stand. Larry testified that Langston had retrieved a handgun from Larry’s house earlier that night and that, in the parking lot of the club, Larry heard someone yell, “[Langston], don’t do that!” McKnight testified that he heard the same thing, and then he saw Langston “coming from behind his back with it in his hand.” In addition to eliciting that testimony, in his closing argument, McKnight’s attorney made a well-reasoned and articulate argument that McKnight had acted in self defense. Here, the attorney’s performance was clearly not deficient.

e. Failure to Subject the. Prosecutor’s Case to Adversarial Testing

¶ 55. Finally, McKnight makes a broad, sweeping argument that his attorney, more or less, allowed the prosecutor to run roughshod over the defense.
¶ 56. McKnight argues that his attorney failed to make a single objection to the prosecutor’s evidence. The only specific instance he cites is the attorney’s failure to object to the prosecutor’s use of Larry’s videotaped statement. Conceivably, the attorney could have objected to the admission of the tape on the ground that it constituted inadmissible hearsay. See M.R.E. 801, 802. In response to such objection, the prosecutor might have responded that he was using it as extrinsic evidence of Larry’s prior inconsistent statement for impeachment purposes. See M.R.E. 618(b). If the circuit court had allowed the tape to be admitted on that basis, McKnight’s attorney might have requested a limiting instruction, instructing the jury not to use the tape as proof of the matter asserted.
¶ 57. However, even if McKnight’s attorney had succeeded in suppressing the videotape or obtaining a limiting instruction, this Court is not persuaded that the outcome of the proceeding would have been different. It is quite clear that the testimony of Hoskins and Montgomery heavily influenced the jury, and their testimonies were unaffected by the issues surrounding the videotape.
¶ 58. McKnight also argues that his attorney failed to cross-examine the prosecutor’s witnesses meaningfully, which left contradictions in their testimonies unexamined. He cites Montgomery’s testimony as an example. Montgomery testified that McKnight was standing by Larry’s truck when he stated: “Roderick Langston, you bitch-ass ni* *er, next time I see you I’m going to deal with you!” Langston was standing by the club’s entrance and said, “I’m right here,” and walked toward McKnight. McKnight then pulled out a gun and shot Langston. According to *1155 Montgomery, McKnight then stepped over Langston’s body and got in the truck.
¶ 59. On appeal, McKnight argues that Montgomery’s narrative is physically impossible, because if Langston was by the club’s entrance then there is no way that McKnight would have had to step over Langston’s body to enter the truck. However, as Montgomery testified, the entrance to the club was very close to where the truck was parked. It is entirely possible that as Langston walked toward McKnight, Langston got close enough to the truck so that when he fell forward after being shot, his body ended up on the ground by the truck.
¶ 60. McKnight further argues that his attorney was deficient because he did not make an opening statement. He acknowledges that failure to make an opening statement is not per se ineffective assistance. Golden v. State, 968 So.2d 378, 388 (¶ 38) (Miss.2007). But he argues, when considered along with the totality of the attorney’s alleged errors, it suffices for ineffective assistance of counsel in this case. However, he fails to show how an opening statement would have affected the outcome of the trial. As it is his burden to show both Strickland prongs, this Court is unmoved. We also note that, while the attorney made no opening statement, he presented a lengthy and cogent closing argument that more than adequately summarized the defense’s theory of the case.
¶ 61. This Court has thoroughly reviewed the record. We are not able to determine that McKnight received ineffective assistance of counsel. Since we find no reversible errors, we affirm the judgment of conviction and sentence. However, we do so without prejudice to McKnight’s right to renew his ineffective assistance of counsel claims in a motion for post-conviction collateral relief, should he choose to file such a motion.
¶ 62. THE JUDGMENT OF THE HUMPHREYS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HUM-PHREYS COUNTY.
LEE, C.J., IRVING, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR. MYERS, J„ DISSENTS WITHOUT SEPARATE WRITTEN OPINION.

. Pursuant to a motion filed with this Court, third-year law students from the University of Mississippi School of Law Criminal Appeals Clinic were appointed special counsel for McKnight. Kristen E. Boyden and Ginevera E.N. Reaves II prepared McKnight's brief. Brad Baskin and Jacob D. Curtis presented oral argument. Professor Phillip Broadhead provided supervision and is the attorney of record.